2012 VT 34

## State of Vermont v. Joseph M. McCarthy

[48 A.3d 616]

No. 10-297

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed May 4, 2012

Motion for Reargument Denied June 11, 2012

500

*Thomas Donovan, Jr.*, Chittenden County State's Attorney, and *Pamela Hall Johnson*, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Montpelier, for Defendant-Appellant.

¶ 1. **Robinson, J.** Defendant appeals from his conviction of involuntary manslaughter following a jury trial. Defendant set up a dangerous shooting range on his property and invited others to join him in firing weapons at the site. An errant bullet struck and killed a neighbor in his nearby home. Defendant argues that: (1) a jury view of the scene presented misleading and prejudicial evidence and was not conducted with the necessary procedural and evidentiary safeguards; (2) the trial judge impermissibly assumed the roles of an advocate and a witness in reviewing the jury view; (3) the court erred by failing to excuse one of the jurors; and (4) his conviction was not supported by sufficient evidence. We affirm.

¶ 2. Viewing the evidence in the light most favorable to the State as the prevailing party, the jury could have found the following. Defendant decided to set up a shooting range in his back yard. On September 23, 2008, he invited several friends to come shoot at the range. When the friends arrived at the mowed out area by defendant's house, at defendant's direction they set up the targets on several stumps. One of the friends brought over a shooting bench and placed it at the north side of the range. The direction from the bench to the targets was south by southwest. The distance between the bench and the targets was approximately forty-three yards.

¶ 3. Behind the target area was a stone and rock wall approximately one to two feet high. Several trees were slightly in front of the rock wall. Beyond the wall was a sparsely wooded area about 200 feet deep, and beyond that were open fields. The landscape to the south rose slightly and gradually, but there were no significant hills or anything else to act as a berm behind the wooded area.

¶ 4. Approximately 250 yards from the shooting bench, in the general direction of the targets, was a home belonging to the Reiss family. From the shooting bench, the difference in angle to the target versus to the Reiss home was only six degrees. The difference in elevation between a shot at the target and a shot at the Reiss home was less than two inches. As a consequence, if a shooter pointed the gun barrel three inches to the right of the target that was forty-three yards away, and just under an inch up, the shot would hit the neighbor's house.

¶ 5. The Reiss house was visible from a mowed path leading down to the shooting area. One of the members of the group noted the neighboring house, and defendant assured him that the trees and hills behind the targets made the shooting arrangement safe. By his own admission, defendant had no way of knowing whether he or his fellow shooters would consistently hit their targets, or whether either of his friends were good shooters. Defendant also acknowledged that he should have been aware of the fact that a bullet could go high and to the right, leaving nothing to stop it.

¶ 6. Members of the group took turns firing a variety of firearms, including rifles with maximum ranges of over two miles. One of these rifles was a SKS-style semi-automatic rifle. Three people, including defendant, fired the SKS. Although he had recently taken a hunter safety course, defendant himself had little experience with high-powered rifles.

¶ 7. Toward the end of the group's shooting session, the neighbor, John Reiss, was eating dinner in his home when he was killed by an errant bullet fired from defendant's shooting range. The fatal bullet was fired from the SKS rifle.

¶ 8. Defendant was charged with involuntary manslaughter. The information alleged that he unlawfully caused Reiss's death and acted with criminal negligence by setting up a shooting range in an inherently dangerous location and by allowing for the discharge of rifles in that location in violation of 13 V.S.A. § 2304. Following

a jury trial, which included a site visit, the jury found defendant guilty. After the trial court denied his motion for a judgment of acquittal or a new trial, defendant appealed.

I.

¶ 9. Defendant first challenges the site visit conducted during the trial, as well as the surrounding proceedings. He argues that the court should not have allowed the visit under Vermont Rule of Evidence 403, that the visit itself was not conducted properly, and that in making its record of the site visit the trial judge impermissibly became a witness and advocate in violation of Vermont Rule of Evidence 605 and Vermont's Code of Judicial Conduct. We consider each argument in turn.

A.

¶ 10. In its motion for a site visit, the State explained that its trial evidence would focus largely on what defendant knew, or should have known, about the risks associated with the location of his shooting range. Critical to that analysis, the State asserted, was for the jury to be able to visualize the topography of the properties, the "backdrop" that defendant used for his shooting area and the surrounding area, the view of the Reiss property from various locations on defendant's property, and the general geographic surroundings. The State argued that the unique features of these scenes could not be fully conveyed through photographs, maps, or videos. The State acknowledged that the conditions at the respective properties had changed since September 2008, but argued that the changes would be so obvious that they would not mislead jurors or cause them to ignore evidence offered at trial.

¶ 11. Defendant opposed the State's request. He argued that a site visit would confuse and mislead the jury and unfairly prejudice him. Defendant asserted that the scene had not been preserved and that critical landmarks had either been moved or removed. He also noted that the view would occur in May, rather than September, which might give jurors misleading ideas about what was visible at the time of the incident. Defendant maintained that photographs of the scene were the best evidence and that the site view would be needlessly cumulative.

¶ 12. Following a hearing, the court granted the State's motion, concluding that a view would assist the jury in understanding the

general geographic layout of the area; would allow the jurors to gain a full understanding of the evidence and the scene's unique features, which could not be entirely conveyed by other means; and would not unduly prejudice defendant since the purpose was not to "appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *State v. Bruyette*, 158 Vt. 21, 31, 604 A.2d 1270, 1274 (1992) (quotation and alterations omitted). To the extent the scene had changed from the time of the events at issue, the court continued, it could curtail the risk of jury confusion by instructing the jury to keep in mind the other evidence presented at trial when viewing the conditions of the property.

¶ 13. Defendant challenges this ruling on appeal. He essentially reiterates his position below, arguing that there were material changes to the scene which could have misled or confused the jury. He also complains that a remedial instruction given by the court was not effective because it was not delivered "promptly" after the jury viewed the evidence and because the language used was "too weak to correct such a prejudicial error."

¶ 14. The trial court has discretion in exercising its inherent power to allow or deny a request for a jury view, subject to the constraints of the Vermont Rules of Evidence. See *Alberino v. Balch*, 2008 VT 130, ¶ 8, 185 Vt. 589, 969 A.2d 61 (mem.) (recognizing that "the finder of fact may conduct a site visit or other analogous inspection, and may base its findings upon such examination together with all the evidence in the case" (quotation and emphasis omitted)); *State v. Brown*, 147 Vt. 324, 328, 515 A.2d 1059, 1062 (1986) (reviewing request for a jury view with respect to a crime that predated V.R.E. 403); see generally V.R.E. 402-403 (addressing admissibility of relevant evidence). The trial court's discretion to allow relevant but arguably prejudicial evidence is particularly broad because Rule 403 provides for exclusion only when the danger of unfair prejudice *substantially* outweighs the probative value. *State v. Lee*, 2005 VT 99, ¶ 11, 178 Vt. 420, 886 A.2d 378. Unless the trial court either totally withheld its discretion or exercised it "on clearly untenable or unreasonable grounds," the trial court's evidentiary ruling will stand. *Id.*

¶ 15. As set forth above, the trial court thoughtfully evaluated the potential value of a site visit in this case in which the

topography and natural features of the site were of critical importance. The court recognized that there would be changes to the scene, but found that the changes would be obvious and not prejudicial to defendant, and that any confusion could be addressed with a cautionary instruction. We cannot conclude that the trial court abused its discretion in reaching these conclusions. The court plainly "weighed the competing interests here and its conclusion was within its discretion." *State v. Wheel*, 155 Vt. 587, 604-05, 587 A.2d 933, 944 (1990); see also *Ledford v. State*, 709 S.E.2d 239, 254 (Ga. 2011) (holding that, despite changes at crime scene, trial court did not abuse its discretion in allowing jury site visit in capital murder trial "because the scene view might have aided the jurors in their understanding of the evidence despite the changes and because the jurors were able to see the original condition of the scene in the photographs that were in evidence").

¶ 16. Moreover, the court amply addressed concerns about changes to the site with instructions to the jury both before and after the site view. The evening before the jury view, the court described the myriad ways in which the specifics of the scene they were going to visit differed from the scene at the time of the shooting: the stumps that supported the target at the time of the original shooting were gone, the bench was not likely in the same location, trees had likely changed, and time had passed. The court explained that the purpose of the view was for the jurors to "get a general perception of how everything relates," and "for the big picture not for the small picture." The court advised the jury to look at how the shooting area related to the houses and the surrounding vegetation "in the gross sense." The court further explained that with respect to the specifics, the jury should not rely on its observations at the site but, rather, should consider the photographs of the scene as it appeared following the shooting that had been entered into evidence. In fact, the court sent a notebook of the photographs admitted into evidence with the jury during the jury view so that the jury could relate the actual photographs that depicted the scene of the shooting to the broader surroundings on the site visit. Following the view, the court reiterated to the jury its admonition about the changes to the specifics of the site and the limited purpose of its visit.[1]

---

[1] Defendant argues that the curative instruction after the site visit was not sufficiently immediate in time after the visit to avert the unfair prejudice. This

¶ 17. The court's instructions were sufficient to ward off the potential confusion the jury may have otherwise experienced as a result of the changes in the site between the day of the shooting and the day of the jury view, and to limit the purposes for which the jury considered the view. We presume that the jury followed the court's instructions. *State v. Messier*, 2005 VT 98, ¶ 15, 178 Vt. 412, 885 A.2d 1193.

B.

¶ 18. We next turn to the site visit itself. Prior to the site visit, the court informed the jurors that they could not talk amongst themselves about what they saw. Additionally, the court indicated its expectation that the jury would be walking as a "semi group," although they could branch off a little. The court provided counsel with the opportunity to propose additional instructions to the jury, but neither party did so.

¶ 19. During the site visit, each juror was provided with a diagram depicting the properties. One juror carried a binder containing all of the photographs admitted at trial, and a court officer carried a large aerial photograph depicting where the specific photographs were taken. The jurors were told that they could reference these materials during the site view.

¶ 20. Following the site visit, the court recited its observations concerning the conduct of the visit into the record. It did so on the record in the presence of counsel, but outside the presence of the jury and without any objection from counsel. The court recounted that the group had gone first to the Reiss home and then to defendant's property. It noted that the jurors had scattered more while visiting defendant's property. The court also explained that the group had gone down to the shooting range by one path and back by a second path. The court acknowledged that defense counsel raised concerns about the decision to go back by the second path but the court declined to address her objections because "it wasn't an appropriate place to entertain the conversation." The court noted that the Reiss house was visible from both paths, although probably more visible by the first path used by the parties. At defense counsel's request, the court stated on

argument fails to take into account that the trial court cautioned the jury about the limited purpose of the view and the likely changes in the locations of stumps and benches even *before* the jury view.

the record that the press had been present at the site view. The court also instructed the jury again, at defense counsel's request, that the stumps and shooting bench had been moved since September 2008. Neither party asked to correct or supplement the record beyond that.

¶ 21. In his motion for a new trial, defendant argued that he was prejudiced by "the conditions under which the site visit occurred." He argued that the jurors had been seen walking around separately, as well as in small groups, and that it was impossible to know if they had talked about the case — particularly when groups of jurors were looking at the binder of photographs at the same time. Defendant also asserted that one juror was seen trying to "reenact" the shooting.

¶ 22. The court denied the motion for new trial. As an initial matter, it disagreed with many of the factual assertions in defendant's motion. The court reiterated its prior summary of the site view and supplemented its findings. With respect to defendant's argument about the jury staying together during the site visit, the court found that defense counsel had been given the opportunity to propose instructions for the site view and that counsel had at no time mentioned that she wanted the jury to walk around the site together. The court also concluded that counsel overstated the extent to which jurors were dispersed during the view. The group had not been allowed to roam free, the court explained. Rather, they were led to one area, allowed to look around that area, then led to another area and allowed to look around again.

¶ 23. The court recognized that three or four jurors had been looking at the photo book together, and in response, the court had again told the jurors not to discuss any aspect of the case. The trial judge also explained that he had remained up on a hill during the site view so that he could keep track of the jurors and ensure they were not talking or being approached. As to the juror who was allegedly reenacting the shooting, the court found that the juror appeared to be trying to get a better idea of the angles involved. The court did not consider this to be an improper reenactment; rather, it found that the juror was trying to work though evidence in his own manner. Based on these and other findings, the court denied defendant's motion.

¶ 24. On appeal, defendant reiterates the above arguments and also points to the court's refusal to entertain an objection to the

jury's using the second path to the shooting range and the court's speaking with members of the press who were present on site as evidence of the lack of procedural safeguards in connection with the view. Defendant argues that in light of these factors, the jury view gave rise to improper extraneous influences on the jury.

¶ 25. The court may grant a new trial on a defendant's motion "if required in the interest of justice." V.R.Cr.P. 33. The trial court has discretion in considering such motions, and "its decision will not be overturned unless its discretion was abused or withheld." *State v. Miller*, 151 Vt. 337, 339, 560 A.2d 376, 377 (1989). One claiming that a jury's verdict is tainted by extraneous influences must demonstrate that the irregularity had the capacity to influence the result of the trial. *State v. Griffin*, 152 Vt. 41, 45, 563 A.2d 642, 645 (1989).

¶ 26. We agree with defendant that as a general matter courts should carefully structure jury views, instructing jurors definitively and in advance that they should not talk to one another or engage in independent exploration at the view, supervising the jurors and parties at the site of the view, and being available to address issues as they arise. *United States v. Gray*, 199 F.3d 547, 550 (1st Cir. 1999). We acknowledge that this site visit could have been more tightly managed; however, given the court's repeated instructions regarding the limited purpose of the site visit, we cannot conclude that the court abused its discretion in allowing jurors some latitude as they walked around the general area of the shooting range. Nor is the fact that jurors were conversing among themselves evidence of improper extraneous influence in this case. The court repeatedly reminded the jurors not to talk *about the case*, and we presume that the jury followed the court's instructions. *Messier,* 2005 VT 98, ¶ 15. Likewise, given the court's admonitions that the jury should rely on the evidence admitted in the courtroom with respect to the specific locations of the shooters and targets relative to the neighboring house, we conclude that one juror's use of his arm to help him consider sight lines from various positions does not give rise to a "suspicious taint by extraneous influences," compromising the integrity of the jury's verdict. *Griffin*, 152 Vt. at 45, 563 A.2d at 645. Defendant has not identified any prejudice arising from the jury's access to both paths leading to and from the shooting range, or from the court's interactions with members of the press.

Accordingly, we cannot conclude that the jury view gave rise to irregularities with the capacity to influence the result.

## C.

¶ 27. Finally, defendant argues that the trial judge impermissibly assumed the roles of an advocate and a witness by recording observations on the record, out of the presence of the jury, about the conduct of the site visit. See V.R.E. 605 ("A judge sitting at the trial may not testify in that trial as a witness."); A.O. 10, Canon 3B(5) (requiring judges to discharge their adjudicative duties "without bias or prejudice").

■ ■ ¶ 28. The judge's on-the-record, away-from-the-jury description of the jury view in this case did not constitute "testimony" or advocacy, but was akin to the kinds of observations judges make in the course of their duties presiding over trials. See, e.g., *State v. Forty*, 2009 VT 118, ¶ 27, 187 Vt. 79, 989 A.2d 509 (describing how trial judge observed that witness had been in courtroom during other testimony in violation of sequestration order and therefore did not allow witness to testify); *Wheeler v. Cent. Vt. Med. Ctr.*, 155 Vt. 85, 95, 582 A.2d 165, 171 (1989) ("[T]he judge's observations [of a juror] can be as critical to a disqualification decision as the words of the juror herself."). A trial court's observations about the conduct of a trial are inherent to its role as presiding judge, and trial courts, as a matter of course, draw on their own observations in making legal and factual rulings. *State v. Hampton*, 579 N.W.2d 260, 262-63 (Wis. Ct. App. 1998) (holding that judge who presided over trial and observed dozing juror was not by virtue of his observations a "material witness" disqualified from presiding over subsequent proceeding regarding extent of juror's inattention).

■ ¶ 29. Indeed, courts and commentators have noted the importance of making a record of jury views. See, e.g., *Gray*, 199 F.3d at 550 ("Of obvious importance is the court's responsibility to ensure that what transpires at the view is fully and accurately recorded, most likely by a court reporter."); *In re Application to Take Testimony In Criminal Case Outside Dist.*, 102 F.R.D. 521, 524 (E.D.N.Y. 1984) (noting that a record of a view can be made by television, film cameras, still films, and reporters present to take remarks); H. Wendorf, *Some Views on Jury Views*, 15 Baylor L. Rev. 379, 384 (1963) (explaining that lack of record of jury view

can be adequately addressed by providing a summary of view proceedings in record). We acknowledge that the better practice is to make a record using video or in some cases a court reporter, but recognize that the trial court's oral summary of the jury view was intended to create some record of the proceedings.

¶ 30. Defendant's reliance on our decision in *State v. Gokey*, 2010 VT 89, 188 Vt. 500, 14 A.3d 243, is misplaced. In that case, the trial court was trying to address concerns with the defendant's health and respond to the defendant's request to continue the proceedings on the third full day of trial. Before notifying counsel and giving the parties the chance to object and call witnesses on the question, the court interviewed in chambers the officers who had transported the defendant to court about the defendant's demeanor, and contacted a pharmacist to discuss the effects of medication taken by defendant. This Court held that, in so doing, the trial judge became a witness through off-the-record fact-gathering and by initiating ex parte communications; the court stepped out of its role as a neutral judge by gathering and relying on evidence that disproved claims about defendant's condition. *Id.* ¶¶ 15-16. In this case, the issue is different. Counsel for both parties were present at the jury view, along with the court. As in *Gokey*, the court recounted its observations on the record in the presence of counsel. In contrast to *Gokey*, however, the court's underlying observations of the jury view were made in the presence of counsel so that when the court recounted its observations, both parties could then note their specific objections or request that the court include additional observations on the record. In fact, at defendant's request the court did address on the record additional matters relating to the conduct of the jury view. Thus, the court's statements here are less those of a witness and more those of a reporter, and *Gokey* is inapposite.

## II.

¶ 31. Defendant next argues that he was denied the right to a trial by an impartial jury because the court did not remove a juror based on that juror's friendship with one of the prosecutors, and on the juror's conversation with the prosecutor during the jury view.

¶ 32. During voir dire, one of the prospective jurors stated that she thought she might know the wife of one of the prosecuting attorneys, Mr. Jiron, from church. She noted that she had last

interacted with Mr. Jiron's wife five years earlier. In response to the State's inquiry, the juror indicated that this contact would have no impact on her ability to be impartial. Defendant did not inquire about this relationship during voir dire and did not move to strike the juror.

¶ 33. During the site visit, the juror and Mr. Jiron engaged in one-on-one conversation. When they returned to court, defendant raised the issue and Mr. Jiron recounted that he had exchanged pleasantries with the juror about their respective families. Mr. Jiron stated that he had not spoken to the juror in three to four years, possibly longer, and that he had seen the juror only at church and did not socialize with her outside of church other than one lunch at the juror's home with his family three to five years earlier.

¶ 34. At defendant's request, both the court and defense counsel questioned the juror; her account of the conversation during the jury view and of their prior relationship was consistent with Mr. Jiron's. The juror reiterated her belief that the relationship would not affect her view of the case. Following this exchange, the court denied defendant's request to excuse the juror for cause.

 ██ ¶ 35. On appeal, defendant argues that the trial court should have dismissed the juror in question for cause once the extent of her relationship with Mr. Jiron became apparent, and in light of their social exchange during the jury view. "Criminal defendants have a constitutional right to trial by an impartial jury." *State v. Sharrow*, 2008 VT 24, ¶ 6, 183 Vt. 306, 949 A.2d 428. "Trial courts must safeguard this right by excluding from the jury persons who evince bias against the defendant." *Id.* This Court has recognized that "[t]he law infers bias when, irrespective of the answers given on voir dire, the prospective juror has such a close relationship with a participant in the trial . . . that the potential juror is presumed unable to be impartial." *Id.* ¶ 14. As we have explained, "the doctrine of implied bias is reserved for *exceptional situations* in which objective circumstances cast concrete doubt on the impartiality of a juror." *Id.* ¶ 16 (quotations omitted, emphasis added).

¶ 36. Thus, for example, we have found implied bias as a matter of law where a juror was a current patient of a defendant-doctor in a malpractice suit. *Jones v. Shea*, 148 Vt. 307, 310, 532 A.2d 571, 573 (1987) (noting the "powerful trust that a patient may

have in his physician's professional judgment"). We have concluded that a parishioner in a religious organization whose leaders had publicly asserted that a case posed substantial financial risk for the organization with possible adverse consequences for its members should be disqualified on the basis of implied bias from sitting as a juror in that case. *Turner v. Roman Catholic Diocese of Burlington, Vt.*, 2009 VT 101, ¶ 65, 186 Vt. 396, 987 A.2d 960; see also *State v. Kelly*, 131 Vt. 358, 360-61, 306 A.2d 89, 90 (1973) (holding that prospective juror who was mother of a secretary at state's attorney's office and aunt of state prison guard was presumptively unable to be impartial where defendant stood accused of attacking another state prison guard).

¶ 37. On the other hand, we have declined to infer bias as a matter of law when a juror was a *former* patient of a defendant-doctor in a malpractice suit, *Jones*, 148 Vt. at 310, 532 A.2d at 573, when a juror was a police officer who had taught and worked with some of the law enforcement officers the State planned to call as witnesses, *Sharrow*, 2008 VT 24, ¶ 17, and where a prospective juror in a sexual assault case had a granddaughter who was the victim of a sexual assault, *State v. Percy*, 156 Vt. 468, 477-81, 595 A.2d 248, 253-55 (1990).

■■ ■■ ¶ 38. This case does not present the kind of "exceptional circumstances" required to trigger a finding of implied bias. The juror in question had a passing acquaintance with the prosecutor several years before the trial began and engaged in a brief exchange of pleasantries with counsel during the jury view, but their relationship was not "close." Accordingly, the trial court did not err in declining to excuse the juror on the basis of her acquaintance with a prosecuting attorney.[2]

---

[2] To the extent that defendant frames his argument in terms of prosecutorial misconduct as opposed to implied bias, our conclusion is the same. In voir dire, the juror acknowledged a past acquaintance with one of the prosecuting attorneys. Defendant did not follow up with any questions about the extent of the acquaintance. Had the record ultimately revealed that the juror's initial representations were inaccurate, or that the prosecutor and juror did in fact have a relationship that would support a challenge for cause, we would agree with defendant that the prosecutor had an obligation to proactively correct or supplement the record following the juror's statements. See, e.g., *State v. Mathias*, 1994 WL 116243, at **10-13 (Ohio Ct. App. March 31, 1994) (holding that prosecutor should have proactively disclosed his recent prior representation of one of jurors). We agree that the better course would have been for the prosecuting attorney to avoid the

## III.

¶ 39. Finally, defendant argues that the evidence was insufficient to support his conviction because it does not support a finding of criminal negligence, and because the causal connection between his acts and the victim's death was too attenuated. We consider each claim in turn.

¶ 40. When reviewing the court's denial of a motion for judgment of acquittal, we ask

> whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt. A judgment of acquittal is proper only if the State has failed to put forth any evidence to substantiate a jury verdict.

*State v. Turner*, 2003 VT 73, ¶ 7, 175 Vt. 595, 830 A.2d 122 (mem.) (quotations omitted).

¶ 41. To establish defendant's guilt of involuntary manslaughter, the State needed to prove that "defendant engaged in a level of conduct that met the criminal negligence standard and caused the victim's death." *State v. Viens*, 2009 VT 64, ¶ 21, 186 Vt. 138, 978 A.2d 37. As we have explained:

> Criminal negligence means something more than ordinary carelessness. It means that the State must prove that the defendant acted unaware of the risk of death. It must be of such a nature and degree that his failure to perceive it considering the nature and purpose of his conduct and the circumstances known to him involved a gross devia-

incidental contact and conversation with the juror during the jury view, but cannot conclude that the exchange triggered actual bias on the part of the juror or otherwise prejudiced defendant's rights.

Defendant raised his argument that the Vermont Constitution imposes a uniquely high burden on Vermont courts to ensure the impartiality of Vermont juries for the first time on appeal; accordingly, we review only for plain error. *State v. Stell*, 2007 VT 106, ¶ 10, 182 Vt. 368, 937 A.2d 649. For the reasons noted above, we cannot conclude that the court's refusal to excuse the juror "seriously affected substantial rights" and "had an unfair prejudicial impact on the jury's deliberations" in this case. *State v. Erwin*, 2011 VT 41, ¶ 15, 189 Vt. 502, 26 A.3d 1.

tion from the standard of care that a reasonable person would have observed.

*Id.* ¶ 20; see also *State v. Stanislaw*, 153 Vt. 517, 525, 573 A.2d 286, 291 (1990).

■ ¶ 42. In this case, ample evidence supported the jury's finding of criminal negligence. The State presented evidence that the targets at the range set up at defendant's home and under his supervision were oriented such that if a shooter pointed the gun barrel three inches to the right of the target that was forty-three yards away and just under an inch above the target, the shot would hit the neighbor's house. A relatively small error in aim could lead to catastrophic results. The range had an inappropriate backstop made up of low rocks, which would easily ricochet bullets; the few larger trees and stumps on the property were inadequate to stop a bullet from leaving the range; and there was no berm or hill behind the targets sufficient to stop bullets. Moreover, the targets were positioned at a higher elevation than the shooting bench, making it less likely that bullets that missed the target would hit the ground. A certified hunter education instructor who had worked for Vermont Department of Fish and Wildlife for thirty-two years testified that the only gun that could be used safely in such a range was a pellet gun or a BB gun. Into this venue, defendant invited others, whom he did not know to be good shooters, to shoot powerful rifles completely unsuited to the setting.

¶ 43. These dangers were easily ascertainable, and the jury could reasonably conclude that defendant's conduct constituted a gross deviation from the standard of care that a reasonable person would have observed. The State's hunter safety instructor testified in detail about the hunter safety course that defendant had completed ten days before the shooting and testified that an individual who had conscientiously completed the hunter education class would have been aware of the risks that were presented by the range.

¶ 44. Defendant himself acknowledged that he knew that one should determine what lies beyond one's target and make sure there is an adequate backstop when hunting or target practicing; he knew that he should have been aware of the potential for ricocheting bullets; he was aware that the line of fire was oriented in the direction of the Reiss home; that he should have done more

"looking around" before setting up the range; that he had not consulted the hunter safety guidebook to see if his range was a good idea; that he had minimal experience with the more powerful rifles that his friends brought; that he should have but did not ask about the caliber or velocity of the bullets in those guns; that he did not know the shooting ability of two of the friends that he had invited to shoot; and that he did not know if they or he would be able to hit the targets consistently.

¶ 45. Defendant realized that the SKS rifle was "a pretty powerful gun," which meant that it was capable of sending a bullet to a target at a very high energy rate, and understood that if he missed the target and there was nothing to stop it, the bullet would keep going for a very long way. He also recognized the importance of muzzle control and understood that if he moved the muzzle even a little bit, the bullet could go significantly off-target. Defendant was concerned when his friend shot the SKS rifle, but the group nonetheless continued to shoot this gun.

¶ 46. While defendant did not intend to harm his neighbor, the jury could reasonably conclude from the State's evidence that defendant disregarded a substantial risk of death and injury and that his failure to perceive this risk involved a gross deviation from the standard of care observed by reasonable people.

¶ 47. As to causation, the State must prove that "defendant's acts caused [the victim's] death in a natural and continuous sequence, unbroken by any efficient intervening cause. An efficient intervening cause would be an unexpected independent force that broke the connection between the defendant's acts and the victim's death." *Viens*, 2009 VT 64, ¶ 21 n.5; see also *State v. Jones*, 2008 VT 67, ¶ 24, 184 Vt. 150, 955 A.2d 1190 ("[W]here a defendant's unlawful act is established in the chain of direct legal causation he is criminally responsible for the course of events which naturally follow from the act, unless the act of another breaks the chain of causation of the original negligent actor.") (quotations omitted).

¶ 48. Citing language from our opinion in *State v. Yudichak*, 151 Vt. 400, 403, 561 A.2d 407, 409 (1989), defendant argues that his conviction can stand only if his conduct was *the sole* cause of the victim's death, and not merely *a* cause. We have expressly rejected this interpretation of our opinion in *Yudichak*, and we have reaffirmed that pursuant to the above standard a defendant

may be convicted of involuntary manslaughter for the course of events which naturally follow from his or her actions even when the actions were not the sole cause of the harm. *State v. Martin*, 2007 VT 96, ¶ 40, 182 Vt. 377, 944 A.2d 867. Accordingly, we have affirmed an involuntary manslaughter conviction of a defendant who provided a fifth of Bacardi 151 Rum to a thirteen year old who drank most of the bottle before dying of alcohol poisoning, even though the decedent herself took actions that contributed to her demise. *Stanislaw*, 153 Vt. at 525, 573 A.2d at 291. We have affirmed a conviction in a fatal boating-while-intoxicated incident even though the instability of the boat may have contributed to its capsize. *Martin*, 2007 VT 96, ¶ 40. We have affirmed the manslaughter conviction of a defendant who knew the driveway heater was malfunctioning and posed a risk of carbon monoxide poisoning but did not inform the buyers of his home of that risk, even though the faulty appliance contributed to the victims' deaths. *State v. Brooks*, 163 Vt. 245, 252, 658 A.2d 22, 27 (1995).

██ ██ ¶ 49. In this case, defendant's set-up of his shooting range and his invitation to others whose shooting capabilities were largely unknown to him was criminally negligent because it created a serious risk of the very harm that came to pass. Although defendant may not have fired the fatal bullet, his actions set in motion a natural and continuous sequence, unbroken by any efficient intervening cause, culminating in the victim's death. Neither the participation of other shooters at the range nor the errant firing of a bullet constituted an entirely separate chain of events; their firing high-powered rifles in the direction of the victim's home was part and parcel of the chain of events set in motion by defendant's actions. See *Gallimore v. Commonwealth*, 436 S.E.2d 421, 425-26 (Va. 1993) (affirming manslaughter conviction of woman who fabricated story about alleged kidnapping and urged husband and brother of putative victim to get perpetrators, where ensuing altercation and discharge of a gun, resulting in a death, were readily foreseeable consequences of defendant's criminal negligence). For the foregoing reasons, we conclude that sufficient evidence supported defendant's conviction.[3]

*Affirmed.*

---

[3] Over a month after oral argument, defendant, as opposed to his counsel of record, filed a letter reiterating some of the above arguments, and making a

number of other arguments not raised on appeal. Insofar as defendant's letter can be construed as a supplemental brief, defendant did not seek leave of the Court to file such a brief, and we do not consider unsanctioned arguments on appeal. V.R.A.P. 28(c) (after a party files an initial brief and a reply brief, "[n]o further briefs may be filed except with leave of court").