NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 96

No. 2014-269

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Salahdin Trowell | May Term, 2015 |

David Suntag, J.

Steven M. Brown, Windham County Deputy State's Attorney, Brattleboro, for
  Plaintiff-Appellee.

Robert L. Sussman of Blodgett, Watts, Volk & Sussman, P.C., Burlington, for
  Defendant-Appellant

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1. **ROBINSON, J.** Defendant Salahdin (Sal) Trowell appeals from a judgment of conviction of one count of assault and robbery and one count of kidnapping. Defendant contends that the trial court erred in: (1) ruling that he had opened the door to certain cross-examination of a defense witness; (2) refusing to give certain jury instructions that he had requested; and (3) denying his motion for judgment of acquittal on the kidnapping charge. We affirm.

¶ 2. The testimony and other evidence admitted at trial, viewed in the light most favorable to the State, see State v. Sorrell, 139 Vt. 648, 649, 432 A.2d 1188, 1189 (1981), shows the following. At about 11:30 a.m. on May 23, 2013, Christiana Moses was at a grocery store, where she encountered defendant, whom she had met in the past. Defendant was accompanied

by his friend, James Manning. Moses and defendant briefly exchanged friendly greetings. Moses then went to the bus station, where she joined her fiancée Cathlyne Tirrell.

¶ 3. While the couple waited at the bus station, defendant and Manning walked to the apartment of one of their associates, Marcus Koritz. Once they arrived, six men were present: defendant, Manning, Koritz, and three others. Defendant began to speak with Koritz out of the earshot of the others. Manning overheard defendant say "I just seen [sic] the bitch" in an aggressive tone. Defendant led the other five men back to the bus station to talk to Moses.

¶ 4. At 12:05 p.m., the men, appearing angry and upset, "surrounded" both women and confronted Moses. Defendant, who was "tensed up" and "hyper," began angrily yelling at Moses. He demanded that she tell him the whereabouts of D.J. Cody, a mutual acquaintance. Defendant made references to Cody owing him money and stated "I want my fucking money" and "You need to get me my fucking money." Defendant then said something along the lines of "I have twenty minutes to find D.J." Both women were frightened and intimidated. Moses made several calls, but was unable to reach Cody. The group became angrier and louder, moving closer to Moses. Moses testified that "if I had turned my face, I probably would have touched [defendant]." Defendant made a reference to "kicking [Moses] in [her] face when [she] was down." Another member of the group said something to the effect of "Do you think we're joking?" Defendant instructed the other men not to "do anything to her right now . . . they'll see you on the cameras" and said, "We can't do anything here because there are cameras," referring to surveillance cameras at the bus station.

¶ 5. Ultimately, defendant instructed Moses to give him everything she had on her. Moses reached in her pocket, pulled out $50, and handed it to defendant, who put it in his pocket. Moses testified that she believed that if she refused to hand over cash to defendant, "all . . . of them would have beat me up there." Noticing a police car arriving at the station, defendant,

Manning, and Koritz then left the scene. Defendant instructed the three other men to watch Tirrell and Moses and not to let them go.

¶ 6. At 12:16 p.m., as defendant, Manning, and Koritz were leaving the scene, a Brattleboro Police Department cruiser arrived at the bus station. An officer briefly spoke to the three men who had stayed behind. The women did not speak to the officer or call for help because they feared being beaten by defendant's associates or otherwise retaliated against for talking to the police. Moses was "shaking . . . almost like a cold sweat." The three remaining men left the station, but returned as soon as the officer left.

¶ 7. Meanwhile, Jacobina Carter picked up defendant, Manning, and Koritz in her white Cadillac Escalade. At 12:31 p.m., the Escalade arrived at a parking lot across the street from the bus station. Moses and Tirrell saw the car through the glass windows of the bus station lobby, and recognized it as belonging to Carter, whom they both knew. Koritz got out of the car on defendant's instructions, entered the lobby, and demanded that Moses make several phone calls to Robert Bessette to ask him for drugs, ask some other questions, and find out where Cody was. Manning then came into the lobby and told Koritz that "Sal wants them." Tirrell testified that she feared "the worst," and believed "that somebody would get hurt" if they did not go to the car. Moses felt "intimidated and scared" and believed that going to the car would cause fewer problems than saying no.

¶ 8. As Tirrell and Moses approached the car, Carter did not speak to or look at Moses, which was unusual and made Moses feel nervous, "because it wasn't like her." Defendant told Tirrell and Moses to "get in the fucking car," told Koritz to get in the back seat with the two women, and told Manning to sit in the front passenger seat. As the four complied, defendant turned around, put his head through the driver's side window, and told his associates: "If they act up, fuck them up"; "Somebody better give me my fucking money or I'm going to fuck somebody up"; and "If I go, I'll fucking kill them." Defendant then told Manning "to make

3

sure everything goes all right," then shut the car doors and walked away. Carter then drove away.

¶ 9. Tirrell and Moses did not know where the car was going. Both women had mobile phones, but were afraid to use them. Koritz gave Carter directions to an apartment, which Moses helped locate. The men then left the Escalade, leaving Tirrell and Moses with Carter in the car. The men knocked on the front door of an apartment. A woman holding a baby in her arms opened the door, and a man—Bessette—was also spotted. Koritz and Manning invaded the apartment. Koritz yelled "That motherfucker's here!" Bessette testified that Manning then punched him in the face. When the woman threatened to call 911, Koritz grabbed the woman's phone and smashed it on the ground. From the car, Tirrell and Moses overheard the altercation and a woman's loud screams.

¶ 10. While Koritz and Manning were out of the car, Tirrell sent a text message to a friend at the bus station asking her to call 911. At the same time, Moses called 911, but just said "Yeah, what's up," not telling the dispatcher about their situation because she feared that Carter would overhear. The women did not try to escape, because they did not know if the car doors were locked and they feared retaliation.

¶ 11. Shortly thereafter, Manning and Koritz left the apartment and got back into the Escalade. Carter began driving, and the car was soon stopped by police in response to an alert about a possible abduction of two people. Tirrell and Moses were relieved to be rescued, and told police "they wanted to get out of there." Both women gave separate statements to police, and defendant was arrested later that day.[1]

¶ 12. The next day, defendant was charged by information with one count of felony kidnapping, see 13 V.S.A. § 2405(a)(1)(C), and one felony count of assault and robbery, id.

---

[1] Manning and the State entered into a plea agreement. Under this agreement, Manning pleaded guilty to two felony counts and testified for the State at defendant's trial. Koritz was also convicted in connection with the incident.

§ 608(a).[2] The court held a four-day jury trial. Following the close of State's evidence, the court denied defendant's motion for a judgment of acquittal on the kidnapping charge. The jury returned a guilty verdict, and the court denied defendant's motion for judgment notwithstanding the verdict. Defendant was sentenced to five to ten years' imprisonment on each conviction, to run concurrently. Defendant now appeals, raising several claims. We consider each in turn.

## I. "Opening the Door" to Testimony About Unspecified "Incident"

¶ 13. Defendant first contends that the court erred in allowing the State to elicit, on cross-examination, a certain statement from defendant's sole witness, Bessette. Bessette testified that he was at the apartment when Manning and Koritz invaded it and attacked him and his ex-girlfriend. On direct examination, defense counsel asked how he knew one of the men, and Bessette responded "from hanging out on the streets and just associations." Defense counsel then elicited testimony from Bessette that he had known Moses and Tirrell for five years and that they had a reputation in the community as "very dishonest" and "compulsive liars."

¶ 14. In a sidebar immediately following, the prosecutor indicated that the State wished to introduce testimony that Koritz had confronted Bessette the evening before at a hotel room, when Koritz was searching for missing heroin.[3] The prosecutor argued that Bessette had misleadingly suggested in his testimony that he had only a "random" passing acquaintance with Koritz, and that as a result Bessette had "opened the door" to further testimony to complete the picture. Citing Vermont Rule of Evidence 403, defense counsel objected. Defense counsel argued that the prejudicial effect of testimony on the prior drug-related encounter between

---

[2] The State also charged defendant with a misdemeanor count of simple assault, but dismissed this charge before trial.

[3] Before trial, defendant filed a motion in limine seeking to exclude, among other evidence, testimony indicating that the crime was drug- and gang-related, and that defendant and his associates were in search of a missing drug debt. This backstory involved a complex series of events featuring several different actors in multiple states. The connection to this case was the series of phone calls that defendant and his associates compelled Moses to make to Bessette, who was believed to have known something about it.

Bessette and Koritz would be "miles beyond the probative value," given the lack of a direct connection to defendant. Ultimately, following an off-the-record discussion in chambers, the State elicited the following testimony on cross-examination:

> [Prosecutor]: And you testified that you knew Marcus [Koritz] from the streets; is that what you said?
>
> [Bessette]: Yes, I did.
>
> [Prosecutor]: Isn't it true—and I only want you to answer this in a yes-or-no fashion—isn't it true, Mr. Bessette, that you knew Marcus [Koritz] from an incident from the evening before?
>
> [Bessette]: No. Not that I—not that I can remember.

Bessette was allowed to refresh his memory with a transcript of a deposition he had previously given. Following this, the following colloquy took place:

> [Prosecutor:] Mr. Bessette, do you now have a better memory of that question I was asking you before?
>
> [Bessette]: Yes, I do now.
>
> [Prosecutor:] And let me ask you—and this is a yes-or-no answer, if you can. You knew Marcus [Koritz] from an incident that happened the night before?
>
> [Bessette]: Yes.

¶ 15. On appeal, defendant renews his contention that it was error for the court to allow the testimony about the unspecified "incident." Defendant acknowledges that "the State's questions did not specifically reference a search for drugs," but argues that Bessette's testimony did not create an incomplete or misleading picture which opened the door to further testimony. Defendant argues that the State's inquiry prejudiced defendant by suggesting a nefarious encounter involving defendant's witness and one of defendant's codefendants, suggesting guilt by association and implying that Bessette had something to hide. The State contends that defendant did not preserve his objection below; that defendant "opened the door" on direct examination; and that, if there was error, it was harmless.

¶ 16. We conclude that even if the evidence was improperly admitted, the error was harmless. See State v. Wright, 154 Vt. 512, 519-20, 581 A.2d 720, 725 (1989) ("Harmless error analysis requires the reviewing court to inquire if, absent the alleged error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error." (quotation omitted)). As defendant himself acknowledged at trial, Bessette had no direct connection to defendant. This nondescript passing reference to an unspecified "incident" was a small component of three days of testimony. Neither the State's question nor the witness's answer implied that the previous day's encounter related to drugs. Moreover, Bessette did not see or testify about the events at the center of the case: defendant's encounter with Moses and Tirell at the bus station, and his subsequent interaction with them by the white Escalade. On these facts, we conclude that there is no reasonable doubt that exclusion of the objected-to question and answer would not have changed the jury's verdict.[4]

## II. Jury Instructions

¶ 17. Defendant next contends that the trial court erred in declining to give two proposed jury instructions. The proposed instructions were that (1) the jury could find reasonable doubt based on conflicts in the evidence, and (2) to prove assault and robbery, the State was required to show that the property taken was of another. In reviewing a claim of error in the jury charge, we review the instructions "as a whole to ensure that they convey the spirit of

---

[4] In reaching this conclusion, we assume without deciding that defendant properly preserved his objection. The record reflects that in the on-the-record sidebar conference, defendant cited to Rule 403 and clearly argued that the probative value of the testimony would be outweighed by its prejudicial effect. We do not know what counsel and the court said in the off-the-record discussion in chambers after this sidebar, and immediately before questions on the Bessette–Koritz "incident" were asked. The parties suggested at oral argument that during this off-the-record discussion, the trial court essentially set the parameters for the questioning that it would and would not permit. If the trial court actually issued a ruling, defendant was not required to renew its objection. V.R.E. 103(a)(2) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). On the other hand, we lack on-the-record evidence that the trial court made a ruling.

the law and there is no fair ground to say that the jury was misled." State v. Bolaski, 2014 VT 36, ¶ 19, 196 Vt. 277, 95 A.3d 460.

¶ 18. The court instructed the jury on the presumption of innocence and on the State's burden to prove defendant's guilt beyond a reasonable doubt. The court further explained to the jury that "a reasonable doubt is a doubt based upon reason and common sense, which comes from a fair and rational consideration of the evidence, or the lack of evidence in the case," and that in weighing the credibility of witnesses, the jury could consider many factors, including whether "other believable evidence in the case fit within the witness' testimony."

¶ 19. We find no error in the court's refusal to expressly instruct the jury that conflicts in the evidence could raise a reasonable doubt as to defendant's guilt and thus preclude conviction. The court's jury instructions "accurately reflect the law," and were not erroneous merely because they did not "employ the exact terms . . . requested" by defendant. State v. Percy, 158 Vt. 410, 419, 612 A.2d 1119, 1125 (1992) (citing State v. Baril, 155 Vt. 344, 351, 583 A.2d 621, 625 (1990)). "Once the trial court has stated the rule of reasonable doubt correctly, nothing further by way of definition is required." Id. (alterations and quotation omitted). Moreover, the instructions given by the trial court did clearly indicate that the jury could find reasonable doubt in conflicts in the evidence. "Within the parameters of the law, the trial court may exercise its discretion in the wording of the jury charge . . ." State v. Rideout, 2007 VT 59A, ¶ 17, 182 Vt. 113, 933 A.2d 706 (quotation omitted).

¶ 20. Defendant also argues that the trial court erred in declining to give his proposed jury instruction stating the State must prove, as an element of the assault-and-robbery crime, that the property taken must have been the property of another. In this case, the judge instructed the jury that it was the State's burden to prove two elements of larceny—that defendant "took money from the person of Ms. Moses" and that defendant "took the money with the intent to deprive Ms. Moses of it permanently, as I have defined those terms for you"—but did not expressly say

8

that the State must prove that the money taken belonged to another. Defendant argues that larceny is an element of the assault-and-robbery charge. See 13 V.S.A. § 608(a) (providing that crime is committed when "[a] person . . . assaults another and robs, steals, or takes from his or her person or in his or her presence money or other property <u>which may be the subject of larceny</u>") (emphasis added). Larceny, in turn, requires that the property taken belong to another. State v. Francis, 151 Vt. 296, 307, 561 A.2d 392, 399 (1989) ("Larceny is the unlawful taking and carrying away of the personal property <u>of another</u> with the specific intent to deprive the person of the property permanently." (quotation omitted) (emphasis added)). The State argues that the omission of a specific instruction on the "personal property of another" point was harmless error.

¶ 21.    Defendant's theory in requesting the "property of another" instruction is that the $50 that defendant took from Moses actually was owed to defendant, and thus was not the "property of another." Defendant's argument fails on both factual and legal grounds. First, not a scintilla of evidence introduced at trial indicated that the money in Moses's pocket belonged to defendant, or even that Moses owed defendant money. At best, the evidence showed that a different person, Cody, owed defendant money. See State v. Nunez, 162 Vt. 615, 617, 647 A.2d 1007, 1009 (1994) (mem.) ("A court's obligation to charge on a defendant's theory is limited to situations in which there is evidence supporting the theory."). On this record, any error by the trial court in failing to specify that the property taken from Moses by defendant must have been "property of another" was harmless.

¶ 22.    Second, and more importantly, even if there were evidence that Moses owed a debt to defendant, defendant's taking of $50 at the bus station would still be the unlawful taking and carrying away of the personal property of another. As one court has summarized:

> [T]here have been cases holding that taking of money from another
> in the good-faith belief that the money was owed to the defendant
> does not constitute larceny or robbery, in that the defendant did not

intend to deprive the victim of the victim's property. This rule, to the extent it ever held sway, appears to have been widely abandoned. In some cases, courts have rejected the rule by reasoning that money owed to a creditor is not the same as money owned by the creditor. In other cases, courts have invoked public policy arguments against self-help.

United States v. Dotson, 407 F.3d 387, 392 (5th Cir. 2005) (citations omitted). The larceny statute and our case law make it clear that larceny involves taking personal property "from the actual or constructive possession of another." 13 V.S.A. § 2501; see also State v. Reed, 127 Vt. 532, 538, 253 A.2d 227, 231 (1969) (larceny is taking the property "from one in lawful possession" without right, with the intention to keep it wrongfully). The trial court did instruct the jury that the State had to prove that defendant took the property "from the person of Ms. Moses," thus informing the jury that he had to take it from her possession. Beyond that, any claim that defendant in this case was entitled to forcibly take the money from Moses because she, or anyone else, owed him money is not supported by the law.

III. Sufficiency of the Evidence to Support Kidnapping Conviction

¶ 23. Finally, defendant argues that the evidence was insufficient to support a conviction of kidnapping, and that the trial court erred in denying his motion for judgment of acquittal. "When reviewing the court's denial of a motion for judgment of acquittal, we ask whether the evidence, when viewed in the light most favorable to the State and excluding any modifying evidence, fairly and reasonably tends to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt." State v. McCarthy, 2012 VT 34, ¶ 40, 191 Vt. 498, 48 A.3d 616 (quotation omitted).

¶ 24. Here, defendant was charged with kidnapping by "knowingly restrain[ing] another person with the intent to inflict bodily injury upon the restrained person or place the restrained person or a third person in fear that any person will be subjected to bodily injury." 13 V.S.A. § 2405(a)(1)(C). To "restrain" is to "restrict substantially the movement of another

person without the person's consent or other lawful authority." Id. § 2404(3). Kidnapping is a dual-intent crime; the prosecution must prove that the defendant both knowingly restrained the victim <u>and</u> intended to commit an additional statutory element,[5] such as placing the restrained person or a third person in fear that any person will be subjected to bodily injury. Alexander, 173 Vt. at 384, 795 A.2d at 1255.

¶ 25. Defendant argues that there was insufficient evidence to prove the additional element of kidnapping at issue here: intent to inflict bodily injury or to put the victim or another in fear that any person would be bodily injured. Defendant argues that defendant's "only purported threat for the purpose of restraining the victims was his instruction to place them in the Escalade," which "was not done with more force than needed." Immediately after this threat, defendant left the scene, rendering it impossible for him to subject the victims to bodily harm. The State's case, defendant suggests, relies on a single threat to support both the unlawful-restraint element and the additional element of bodily injury or threat of bodily injury for kidnapping, essentially collapsing together kidnapping and its lesser included offense of unlawful restraint.

¶ 26. Defendant's argument fails both legally and factually. In <u>Alexander</u>, we reversed a kidnapping conviction because the court denied the defendant's request for a jury instruction on the lesser-included offense of unlawful restraint, and the facts in evidence reasonably supported such an instruction. Id. at 382-85, 795 A.2d at 1253-55. In the course of so holding, we made clear that "the jury [is] entitled to infer both the intent to restrain and the intent to do serious bodily injury from the same facts." Id. at 385, 795 A.2d at 1255. Thus, the same act may show both restraint and the additional element required to prove kidnapping—here, intent to

---

[5] Unlawful restraint requires knowing restraint, while kidnapping requires knowing restraint plus one of five additional elements. Compare 13 V.S.A. § 2405(a) (elements of kidnapping), with id. §§ 2406(a), 2407(a) (elements of second-degree and first-degree unlawful restraint, respectively). See also State v. Alexander, 173 Vt. 376, 378-82, 795 A.2d 1248, 1250-52 (2002) (tracing history of these statutes and distinguishing among them).

place the victim in fear of bodily harm. This principle does not collapse the offenses of kidnapping and unlawful restraint together. See Boyle v. United States, 556 U.S. 938, 950 n.5 (2009) ("Even if the same evidence may prove two separate elements, this does not mean that the two elements collapse into one."). As the State points out, it is entirely possible that a restraint could be unlawful (meeting the element of unlawful restraint), yet not cause "fear that any person will be subjected to bodily harm." For example, a person could be threatened with financial harm without any intent to place the person in fear of bodily harm. Such evidence would support a conviction for unlawful restraint, but not for kidnapping.

¶ 27. Defendant's argument also fails factually. The State did not in fact rely on a single act to show both intent to restrain the victims and intent to place the victims in fear that they would be subjected to bodily harm. Rather, the State's evidence revealed multiple episodes in which defendant specifically threatened bodily harm. At the bus station, defendant warned his associates not to "do anything to [Moses] right now" because of the surveillance cameras, the clear implication being that that Moses might come to physical harm later. Later, defendant ordered the victims to "get in the fucking car" while threatening to "fucking kill them," and instructed his associates to "fuck them up" if they resisted. The testimony shows that the victims were terrorized and feared being beaten or worse. In sum, the evidence was more than sufficient to fairly convince a reasonable trier of fact that the defendant was guilty beyond a reasonable doubt. McCarthy, 2012 VT 34, ¶ 40.

Affirmed.

FOR THE COURT:

_____
Associate Justice

12